**RECORD NO. 16-1183**

**IN THE**

# United States Court of Appeals

**FOR THE FOURTH CIRCUIT**

JOHN T. CADY,

*Plaintiff - Appellant,*

v.

RIDE-AWAY HANDICAP EQUIPMENT CORPORATION;
ELECTRONIC MOBILITY CONTROLS, LLC,

*Defendants - Appellees,*

v.

JOHN H. CADY,

*Third Party Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT GREENBELT

**OPENING BRIEF OF APPELLANT
JOHN T. CADY**

Matthew J. Chalker
THE VALENTE LAW GROUP
2200 Defense Highway, Suite 304
Crofton, MD 21114
(410) 451-1777
mchalker@jvlawgroup.com

*Counsel for Appellant John T. Cady*

**LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477**
**A Division of Lantagne Duplicating Services**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO

2.      Does party/amicus have any parent corporations?                                              YES      NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                                               YES      NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      YES      NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES      NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      YES      NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**************************
I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____                    _____
(signature)                                                                        (date)

# <u>TABLE OF CONTENTS</u>

Rule 26.1 Disclosure Statement of John T. Cady

Table of Authorities ................................................................................v

Jurisdictional Statement ...........................................................................1

Issues Presented for Review .....................................................................1

Statement of the Case...............................................................................1

Statement of Facts ...................................................................................2

Summary of the Argument.......................................................................11

Argument................................................................................................12

    I.     STANDARD OF REVIEW ................................................12

    II.    BECAUSE DEFENDANTS DID NOT ESTABLISH THE CAUSE OF THE CRASH, THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN GRANTING SUMMARY JUDGMENT ON THE GROUNDS THAT PLAINITFF, JOHN T. CADY, WAS CONTRIBUTORILY NEGLIGENT, ASSUMED THE RISK AND ENGAGED IN PRODUCT MISUSE ....................13

        A.    Defendants failed to establish that any act or omission of Plaintiff caused Plaintiff's injuries ...........................................14

        B.    The trial court committed reversible error in granting Defendants' motions for summary judgment on the ground of contributory negligence, because Defendants did not prove causation ......................................................................15

            1.    Legal Standard ................................................15

            2.    Defendants did not establish that any alleged act of negligence committed by Plaintiff proximately caused the crash .........................................................17

i

i.      The trial court' ruling as to contributory negligence...........................................17

ii.     The trial court's ruling as to contributory negligence was reversible error..........................19

C.   The trial court committed reversible error in granting Defendants' motions for summary judgment on the ground of assumption of the risk, because Defendants did not prove causation.................................................................22

1.   Legal Standard................................................22

2.   Defendants did not establish that any alleged act of negligence committed by Plaintiff proximately caused the crash.......................................................23

i.      The trial court' ruling as to assumption of the risk...............................................24

ii.     The trial court's ruling as to assumption of the risk was reversible error........................24

D.   Product misuse........................................................27

1.   Legal Standard................................................27

2.   The trial court committed reversible error in granting Defendants' motions for summary judgment as to product misuse because Defendants could not establish as a matter of law that any misuse of the product by Plaintiff "cut off the chain of proximate causation"..................................................28

i.       The trial court' ruling as to product misuse........28

ii.     The trial court's ruling as to product misuse was reversible error.............................28

E.   Failure to read warning...........................................30

1.     Legal Standard ...............................................................30

2.     The trial court committed reversible error in granting Defendants' motions for summary judgment as to failure to read warnings because Defendants could not establish as a matter of law that Plaintiff's failure to read the warnings caused, or was even a cause, of his injuries ...........................................................30

     i.     The trial court's ruling as to failure to heed warnings ...............................................................30

     ii.     The trial court's ruling as to failure to read warnings was reversible error .............................30

III.     THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN GRANTING DEFENDANTS' MOTIONS TO STRIKE, AND EXCLUDE THE TESTIMONY OF, PLAINTIFF'S EXPERT, MARK EZRA...................................................................32

A.     Legal Standard .......................................................32

B.     The Trial Court's Ruling.........................................35

C.     Mr. Ezra's Opinion ................................................37

D.     Materials reviewed by the experts in this case .........38

E.     The trial court's ruling to strike Mr. Ezra was an abuse of discretion and therefore, should be reversed ............................39

1.     Mr. Ezra's opinion was based on sufficient facts and data.................................................................40

2.     Mr. Ezra's opinions were the product of reliable principles and methods ...................................41

     i.     Mr. Ezra's opinions were based substantially on the data produced by the Van immediately prior to the crash...........................................41

ii.    Mr. Ezra's opinions were also based on his observation and measurements ............................42

3.    In spite of Mr. Ezra's factual and data based opinions, the trial court struck him because it did not agree with the conclusions of his opinions.......................................43

4.    Mr. Ezra's opinions were reliably applied to the facts of this case ....................................................47

Conclusion .............................................................................................48

Request for Oral Argument.....................................................................49

Certificate of Compliance .......................................................................50

Certificate of Service ..............................................................................51

# TABLE OF AUTHORITIES

## Cases

ADM P'ship v. Martin,
    702 A.2d 730 (1997)................................................................23

Am. Powerlifting Ass'n v. Cotillo,
    934 A.2d 27 (2007)................................................................23

Anderson v. Westinghouse Savannah River Co.,
    406 F.3d 248 (4th Cir. 2005)...........................................34

Atlantic Mutual v. Kenney,
    591 A.2d 507 (1991)...........................................................17

Baltimore Gas & Elec. Co. v. Flippo,
    684 A.2d 456 (Md. Ct. Spec. App. 1996).....................16

Batten v. Michel,
    292 A.2d 707 (Md. Ct. Spec. App. 1972).....................16

Cavallo v. Star Enter.,
    100 F.3d 1150 (4th Cir.1996) ........................................33

Cooper v. Smith & Nephew, Inc.,
    259 F.3d 194 (4th Cir. 2001) ...................................12, 35

Crews v. Hollenbach,
    751 A.2d 481, 488 (Md. 2000) .........................22, 23, 25

Daubert v. Merrell Dow Pharm., Inc.,
    509 U.S. 579 (1993)......................... 32, 33, 34, 35, 43

Ellsworth v. Sherne Lingerie, Inc.,
    495 A.2d 348 (1985)....................................................27, 30

Evans v. Eaton Corp. Long Term Disability Plan,
    514 F.3d 315 (4th Cir. 2008) ........................................13

General Electric Co. v. Joiner,
    522 U.S. 136 (1997)................................................................12

Higgins v. E.I. DuPont de Nemours & Co.,
    863 F.2d 1162 (4th Cir. 1988) ............................................27, 29

Holbrook v. Lykes Bros. S.S. Co.,
    80 F.3d 777 (3d Cir. 1996) ................................................13, 34

Imbraguglio v. Great Atlantic & Pacific Tea Co.,
    747 A.2d 662 (2000)................................................................22

James v. Jacobson,
    6 F.3d 233 (4th Cir. 1993) ................................................12, 13

Kassama v. Magat,
    767 A.2d 348 (Md. Ct. Spec. App. 2002)............................16, 17

Kumho Tire Co. v. Carmichael,
    526 U.S. 137 (1999)................................................................33, 44

Menish v. Polinger Co.,
    356 A.2d 233 (Md. 1976) ........................................................16

Meyers v. Lamer,
    743 F.3d 908 (4th Cir. 2014) ..................................................23

Myers v. Bright,
    609 A.2d 1182 (1992)........................................................16, 17

Nader v. Blair,
    549 F.3d 953 (4th Cir. 2008) ..................................................12

Nguyen v. CNA Corp.,
    44 F.3d 234 (4th Cir.1995) ....................................................12

Poole v. Coakley & Williams Const., Inc.,
    31 A.3d 212 (2011)................................................................23

vi

Reiser v. Abramson,
    286 A.2d 91 (Md. 1972) .................................................................16

Rosenthal v. Mueller,
    720 A.2d 1264 (Md. Ct. Spec. App. 1998)..............................17, 20

S & S Oil, Inc. v. Jackson,
    53 A.3d 1125 (Md. 2012) .............................................................16

Schwier v. Gray,
    357 A.2d 100 (Md. 1976) .............................................................16

United States v. Downing,
    53 F.2d 1224, 1242 (3rd Cir. 1985)..............................................35

Warsham v. James Muscatello, Inc.,
    85 A.2d 156 (Md. Ct. Spec. App. 2009)......................................23

Westberry v. Gislaved Gummi AB,
    178 F.3d 257 (4th Cir. 1999) ................................................33, 43

**Statutes**

28 U.S.C. § 1332.................................................................................1

28 U.S.C. § 1291.................................................................................1

**Rules**

Fed. R. Civ. P. 56............................................................................12

Fed. R. Evid. 702 ...............................................................32, 33, 44

**Other Authorities**

Restatement (Second) of Torts § 496D cmt. e (1965)..............................23

## JURISDICTIONAL STATEMENT

This appeal is taken from a final judgment entered by the United States District Court for the District of Maryland in favor of Appellees on numerous motions dispositive of this case. Jurisdiction in the District Court existed under 28 U.S.C. § 1332 given the parties' diversity of citizenship. On February 19, 2016, Appellant timely noted an appeal from the District Court's entry of final judgment, which disposed of all of Appellant's claims. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

**I.  DID THE TRIAL COURT ERR IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS ON THE GROUNDS THAT PLAINITFF, JOHN T. CADY, WAS CONTRIBUTORILY NEGLIGENT, ASSUMED THE RISK AND ENGAGED IN PRODUCT MISUSE?**

**II.  DID THE TRIAL COURT ERR IN GRANTING DEFENDANTS' MOTIONS TO STRIKE, AND EXCLUDE THE TESTIMONY OF, PLAINTIFF'S EXPERT, MARK EZRA?**

## STATEMENT OF THE CASE

This is an action for strict product liability, negligence, breach of warranty, breach of contract and fraud, brought under the District Court's diversity jurisdiction. Appellant, John T. Cady, the Plaintiff in this lawsuit, sued Defendants, Ride-Away Handicap Equipment Corporation ("Ride-Away") and Electronic Mobility Controls, LLC ("EMC," and collectively, "Defendants"),

1

alleging that he was severely injured in a one car crash as a result of Ride-Away's strict product liability and breach of contract, and Defendants' collective negligence, breach of warranties, and fraudulent actions.

Dispositive motions were filed, and fully briefed, by Plaintiff and Defendants, and argued before the trial court on January 19, 2016. The trial court granted EMC's Motion for Summary Judgment as to Contributory Negligence & Assumption of the Risk, EMC's Motion for Summary Judgment as to Counts I-X of the Amended Complaint, EMC's Motion to Exclude Testimony and Opinions of Plaintiff's Mechanical Engineering Expert Mark Ezra and Motion for Summary Judgment, and Ride-Away's Motion in Limine to Exclude Expert Testimony and Motion for Summary Judgment. All of Plaintiff's motions were denied. Based on its ruling, the trial court dismissed Plaintiff's Amended Complaint and entered judgment in favor of Defendants. This appeal followed.

## STATEMENT OF FACTS

### Underlying Facts

The instant case arose from the one vehicle crash of the Buick Terraza Van driven by Plaintiff on January 7, 2010. This crash resulted in the severe injury of Plaintiff, resulting in permanent and life-altering injuries, multiple surgeries, and approximately $1,000,000.00 in medical expenses.

2

On or about April 24, 2008, Ride-Away sold to Plaintiff and Plaintiff's handicapped son a 2007 Buick Terraza Van ("the Van"), for use by Plaintiff's son, John H. Cady ("Junior"). [178]. The Van was equipped with an AEVIT, WL series, explained infra, which was designed and manufactured by EMC, and installed by Ride-Away, to allow a quadriplegic like Junior to drive.

On January 7, 2010, Junior encountered a problem with acceleration in the Van. [84-87]. On the evening of January 7, 2010, Plaintiff learned of this problem, at which time he travelled to the location of the Van. [Id.]. Plaintiff attempted to take the vehicle out of handicapped mode, and then change it to able-bodied mode. [847]. However, Plaintiff had difficulty engaging the pins and realized he would be forced to drive the vehicle with brakes and steering in the handicapped mode, and the gas in able-bodied mode. [847-48]. As a result, he test drove the Van around the parking lot in which the van was located, and having no problems with the gas, braking or steering, began to drive the van home [452], as he was instructed to do by Fred Hermann, a Ride-Away employee. [84-85].

After driving approximately two to three miles from the parking lot, Plaintiff lost control of the vehicle and collided with a tree. [458-59, 474]. During the few seconds immediately prior to the crash, Plaintiff was applying the

break, but the Van did not slow or respond to the braking.   [790-91; 2162].

Instead, the Van accelerated, ultimately causing the Van to crash.   [Id.].

Plaintiff suffered catastrophic injuries, primarily to his lower extremities,

including, but not limited to a shattered hip and pelvis.   [17-18].   As a result of

these injuries, Plaintiff was required to undergo multiple surgeries and has incurred

approximately $1,000,000.00 in medical expenses.

*The AEVIT System*

The AEVIT drive-by-wire system is broken down into primary and

secondary controls.   [873].   The primary controls, which are at issue in this case:

> interpret the driver's movements of the steering and gas/brake inputs.
> The inputs typically have orthotic devices such as joysticks or mini-
> wheels attached to them, and the driver manipulates these devices.
> These movements are converted into digital signals that are sent to
> corresponding steering and gas/brake drive modules.   The steering and
> gas/brake drive modules then send signals to intelligent
> electromechanical servomotors mounted on the steering column, the
> gas pedal and the brake pedal.   Put simply, when the driver uses the
> gas/brake input to call for acceleration, the gas/brake servo responds
> and moves the gas pedal.   When the driver uses the steering input to
> turn the van, the steering servo rotates the steering column.   When the
> driver uses the gas/brake input to call for brake, the gas/brake servo
> depresses the brake.   [874].

More specifically, the brakes are controlled by a drive-arm.   [876].   A drive

arm is mounted to the spool so that:

> as the motor rotates in the braking direction, so does the drive arm.   A
> white plastic roller on the drive arm acts as the contact point between
> the drive arm and the brake pedal.   As the servomotor rotates in the
> brake direction, **the drive arm rolls counter-clockwise against the**

4

**brake pedal, depressing it downward and applying the brakes**.
[876] [emphasis added].

### *Data Generated by the AEVIT System and the Van*

"The AEVIT system comes equipped with a data logger that digitally records all movement of the input devices, all signal transmissions received and sent by the drive modules, and all movements of the servomotors." [6]. "The AEVIT data recorder functions the same as the black box of an airplane, and it complements the OEM black box that comes standard on all late model vehicles (including the 2007 Terraza)." [Id.]. In this case, data was recovered from both the AEVIT and Terraza data records." [Id.].

### *Conversion of the van from AEVIT to OEM*

The van can be converted from the AEVIT operation to OEM so that an able-bodied driver can operate the van with "normal" gas, braking and steering. [144-45]. In order to convert the AEVIT system to able-bodied mode, certain pins need to be disengaged and then reengaged. [Id.]. The manual explains the pins and the process as follows:

Step 4:    The engage lever has two pins. The larger is the Safety Detent Pin and can be completely removed. The smaller pin is the Indicator Pin which is spring-loaded and captive. Reach down and pull the Safety Detent Pin out of the engage lever.

Step 5:    Apply a very small amount of pressure to the engage knob and Pull out the Indicator Pin about a ¼". The knob is spring loaded, so you should feel some resistance.

Step 6:

Continue to push in the engage knob until you feel the Indicator pin lock in place.

Replace the Safety Detent pin in the Engage lever. [144].

In layman's terms, "you have to pull the [safety pin] out" [1092] "[a]nd, push the yellow knob [straight in], until it engages the steering wheel." [1122]. The purpose of the Safety Pin is to prevent the Engage lever from becoming disengaged while the van is being driven. [145].

## Experts

### *Plaintiff's Expert*

Plaintiff designated Mark A. M. Ezra, PE, a professional engineer, as his expert engineer in this case. By way of background, Mr. Ezra obtained a Bachelor of Science in Mechanical Engineering in 1972 from Victoria University of Manchester, England in 1972. [2187]. He then obtained an advanced Diploma in Technology: Theory and Practice of Automatic Control from the same university in 1973. [Id.].

Mr. Ezra has been employed as an engineer since 1973 and has worked in the field of forensic engineering since 2006. [2187-89]. He is a member of the National Society of Professional Engineers, Society of Automotive Engineers, Missouri Society of Professional Engineers, American Society of Mechanical Engineers, Institution of Mechanical Engineers (UK), and is a Fellow in the National Academy of Forensic Engineers. [2190]. As a forensic engineer, Mr.

6

Ezra has served as an expert for both plaintiffs and defendants, on numerous occasions for each. [2196 – 2206]. Moreover, he has been qualified as an expert in Federal lawsuits involving "functionally identical gas/brake system designed by Electronic Mobility Controls. . ." [2144]. He has also "analyzed two other Electronic Mobility Controls' AEVIT equipped vans involved in crashes." [Id.].

Mr. Ezra's ultimate opinions in this case were laid out thoroughly in his two expert reports. In his initial report, Mr. Ezra offered the opinions that the brake control system "lost control of the subject van's braking system when the roller on the output arm of the gas/brake servo motor mechanically lost contact with the EMC brake pedal extension plate"; "[t]he loss of braking control by the AEVIT gas/brake control system resulted from a defective installation and positioning of the AEVIT gas/brake servo motor by defendant Ride-Away"; and that the disengagement of the arm roller resulted in the inability of Plaintiff to apply the brakes, causing the Van to crash. [2165].

After additional information was developed during the course of the case, and Mr. Ezra had the opportunity to conduct a second review of the Van, he offered the following opinions in his supplemental expert report:

> 1.    As installed in the Cady van, the gas/brake servo motor output wheel never covered the EMC brake extension bracket tongue in the manner . . . intended by the EMC design. **This installation error resulted in the brake/servo wheel being able to migrate to a position underneath the EMC brake pedal extension bracket. The migration of the output roller occurred, more probably than not,**

7

**due to normal twisting of the subject van's passenger compartment about the van's neutral longitudinal axis shortly before the accident.** The twisting was caused by road loads experienced by the van while travelling down the roadway, shortly before the area of the subject crash.

3. The analysis of the electronic data presented in our Expert Report dated August 16, 2013, and the mechanical observations concerning the gas/brake servo installation and the van performance immediately prior to the crash are supported by the observations made on the February 23, 2015, inspection of the van and the review of the produced installation addendum covering the EMC AEVIT gas/brake installation on a Chevrolet Uplander model platform van.

5. The installer Ride-A-Way made a defective installation of the EMC AEVIT gas/brake servo motor such that gas/brake output roller did not fully cover the brake pedal extension tongue as required by the EMC design.

8. The Cady van passenger compartment structural "box" has not been compromised by the subject crash impact. The floor and supporting chassis rails are undamaged and not deformed; hence, the positioning of the servomotor output roller and the EMC brake extension bracket are as they existed immediately prior to the crash impact.

9. The EMC installation instructions for installation of the EMC gas/brake system into the Chevrolet Uplander model platform van (and therefore the Buick [Terraza] van) are vague in the depicted method of measuring the correct installation position for the gas/brake servo motor support bracket.

10. That the EMC installation dimensions fail to produce an installation in the Cady van such that the output roller of gas/brake servo motor is located fully over the EMC brake pedal extension plate tongue as illustrated in EMC productions Bates EMC 119 through 136.

11.    The results of the February 23, 2015, inspection support the findings expressed in our Expert Report dated August 16, 2013. [1037-40] [emphasis added].

In addition to Mr. Ezra's knowledge, training and expertise in the field of engineering, which are not in dispute, his opinions are mainly based on two grounds: 1) the data derived from the Data Logger and the OEM recorder and 2) the position and flexibility of the brake roller, and his measurement, during his two in-person observations.  [See generally 2149-66; 1031-40].

*Defendant's Experts*

Defendants designated three experts in support of their case as related the AEVIT system and cause of the crash: James Peters, P.E., Philip Nuza and Scott Clendenin.  [919-22; 924-27; 987-92].

Mr. Peters, a professional engineer, possesses engineering credentials similar to that of Mr. Ezra.  Mr. Peters obtained a Bachelor of Science in Mechanical Engineering from the University of Dayton [988] and he belongs to several professional engineering organizations.  [Id.].  However, unlike Mr. Ezra, Mr. Peters did not have an opinion as to what caused the van to crash.  When asked to whether he held an opinion to a reasonable degree of engineering probability as to what caused the crash, Mr. Peters responded by stating, "I don't have a specific cause, no, I don't have a reason – I don't have the cause, as I've mentioned several times already."  [788-89].

9

Mr. Nuza is a general manager at EMC, and named Defendant in this case. [764].  His highest level of education is high school.  [765].  Mr. Nuza held the opinion that Plaintiff caused the crash because he was not properly trained.  [768, 989].  He testified that Plaintiff "wasn't trained on how to use [the AEVIT system] properly, therefore operating in a mixed-mode is something it was never designed or intened to be used in."  [768].  However, Mr. Nuza could not say what act or omission, due to the lack of training, actually caused the crash, which is necessary to establish causation.  [1408-34].

Mr. Clendenin is a service manager at Ride-Away.  [812].  His highest level of education is high school.   [801].   Mr. Clendenin formed the opinion that Plaintiff caused the crash [990], but could not say what specific act or omission of Plaintiff caused the crash beyond "misuse."  [990].  Mr. Clendenin reviewed nothing other than photographs of the van and the expert designation.  [808-09].

### The Underlying Motions and the Trial Court's Ruling

*Underlying Motions*

Following the conclusion of discovery, the parties filed several dispositive motions.  Plaintiffs filed a Motion to Strike Defendant's Experts and Motion for Partial Summary Judgment.  [9-13].

EMC filed a Motion for Summary Judgment as to Contributory Negligence & Assumption of the Risk, a Motion for Summary Judgment as to Counts I-X of

10

the Amended Complaint, and a Motion to Exclude Testimony and Opinions of Plaintiff's Mechanical Engineering Expert Mark Ezra and Motion for Summary Judgment. [Id.].

Ride-Away filed a Motion *in Limine* to Exclude Expert Testimony and Motion for Summary Judgment. [Id.].

The trial court denied both of Plaintiff's motions with little, if any analysis,[1] and granted all of the above-listed Defendants' motions. [2549-50].

## SUMMARY OF THE ARGUMENT

The trial court committed reversible error in granting summary judgment on the grounds that Plaintiff was contributorily negligent, assumed the risk, engaged in product use, and failed to heed warnings because Defendants failed to establish the cause of the crash.

Furthermore, the trial court abused its discretion in granting Defendants' Motions to Strike and Exclude Mr. Ezra because his opinions were founded on sufficient facts and data, he produced an opinion founded in reliable principles and methods, and he reliably applied his opinions to the facts of the case.

---

[1] The trial court's ruling on Plaintiff's motions is not at issue.

# ARGUMENT

## I.    STANDARD OF REVIEW

### *Summary Judgment*

Courts of appeals review "a district court's grant of a motion for summary judgment de novo, applying the same legal standards as the district court." Nader v. Blair, 549 F.3d 953, 958 (4th Cir. 2008) (citing Nguyen v. CNA Corp., 44 F.3d 234, 236 (4th Cir.1995)).   The district court should only grant a motion for summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; Nader, 549 F.3d at 958.   "In deciding a motion for summary judgment, the district court must view all reasonable inferences drawn from the evidence in the light that is most favorable to the non-moving party." Nader, 549 F.3d at 958.

### *Expert Testimony*

"Courts of appeals apply an abuse of discretion standard when reviewing a trial court's decision to admit or exclude expert testimony." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 200 (4th Cir. 2001) (citing General Electric Co. v. Joiner, 522 U.S. 136, 138–39 (1997)).   A trial court can abuse its discretion in a number of ways.   James v. Jacobson, 6 F.3d 233, 239 (4th Cir. 1993).   Notably, discretion can be abused by a trial court if it fails or refuses "to exercise discretion, deciding instead as if by general rule, or even arbitrarily, as if neither by rule or

discretion"; "by failure, in attempting to exercise discretion, adequately to take into account judicially recognized factors constraining its exercise"; or "by an exercise that is flawed by erroneous factual or legal premises." Id. Phrases that have been used by this Court to explain abuse of discretion include "erroneous view of the law," "patently arbitrary application of controlling law," "clearly erroneous assessment of the evidence," "judgment call outside the range of choices permitted," and "error in the weighing process by which discretion is exercised." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008).

## II.   BECAUSE DEFENDANTS DID NOT ESTABLISH THE CAUSE OF THE CRASH, THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN GRANTING SUMMARY JUDGMENT ON THE GROUNDS THAT PLAINITFF, JOHN T. CADY, WAS CONTRIBUTORILY NEGLIGENT, ASSUMED THE RISK AND ENGAGED IN PRODUCT MISUSE.

The trial court committed reversible error in ruling that Plaintiff's claims were barred by contributory negligence, assumption of the risk and product misuse. In order for the defenses of contributory negligence, assumption of the risk and product misuse to have properly served as a bar to Plaintiff's negligence claims, an act or omission by Plaintiff must have proximately caused the complained of injury; establishing a negligent act alone is insufficient. Here, at best, Defendants established negligent acts alone, but failed to independently establish how, or which, of those acts caused the crash. Therefore, Defendants did not establish the

13

defenses of contributory negligence, assumption of the risk and product misuse. However, even without adequate causation evidence before it, the trial court granted Defendants' motions on the grounds of contributory negligence, assumption of the risk and product misuse, thereby committing reversible error.

A.    **Defendants failed to establish that any act or omission of Plaintiff caused Plaintiff's injuries.**

Defendants designated three experts in this case: Mr. Peters, Mr. Nuza and Mr. Clendenin. [919-22; 924-27; 987-92]. None of these experts was able to say how any action or omission of Plaintiff caused the crash, and thus, Plaintiff could not successfully establish the defenses of contributory negligence, assumption of the risk and product misuse. Most notably, Defendants' only expert engineer, James Peters, PE, could not say what caused Plaintiff to lose control of the Van, which is the sole piece of testimony necessary to establish causation. The following exchange, which occurred during Mr. Peters's deposition, highlights Defendants' lack of proof regarding causation:

> Q: So this question is very specific: Do you hold any opinion within a reasonable degree of engineering probability – so I don't want you to tell me what's possible. I just want you to tell me what you can say within a reasonable degree of engineering probability more likely than not was the cause of Mr. Cady losing control.
>
> A: I don't have the specific cause, no, I don't have a reason – I don't have the cause, as I've mentioned several times already. [788-89].

14

Mr. Peters, most literally, had no idea what caused Plaintiff to lose control. Therefore, Defendants could never have proved the causation element of contributory negligence, assumption of the risk and product misuse, based on Mr. Peters's testimony.

Similarly, Mr. Nuza and Mr. Clendenin could muster nothing more than the unsupported conclusion that Plaintiff caused the crash because he was not properly trained and misused the Van. [768, 990]. They could not say how Plaintiff's alleged lack of training caused the crash. [1408-34; 990]. Thus Defendants could never have proved the causation element of contributory negligence, assumption of the risk and product misuse, based on Mr. Nuza's or Mr. Clendenin's testimony.

Absent adequate causation testimony from Defendants' experts, their effort to establish contributory negligence as an affirmative defense should have failed. However, instead of denying their motions founded on contributory negligence, assumption of the risk and product misuse, the trial court granted those motions, without sufficient evidence or testimony to support the causation element of those defenses, thereby committing reversible error.

**B.   The trial court committed reversible error in granting Defendants' motions for summary judgment on the ground of contributory negligence, because Defendants did not prove causation.**

**1.   Legal Standard**

Generally, the question of whether an act is negligent, or contributorily negligent, is a decision for the trier of fact. S & S Oil, Inc. v. Jackson, 53 A.3d 1125, 1132 (Md. 2012). In determining whether the facts of a particular case sufficiently justify a finding of contributory negligence, the rule to be applied "is that 'the act (or omission) so relied on must be distinct, prominent and decisive, and one about which reasonable minds would not differ in declaring it to be negligence.' " Menish v. Polinger Co., 356 A.2d 233, 238 (Md. 1976) (citing Reiser v. Abramson, 286 A.2d 91, 93 (Md. 1972)); S & S Oil, Inc., 53 A.3d at 1132. Thus, "[w]hen there is a conflict in the evidence as to material facts relied on to establish contributory negligence, it is for the jury, not the court, to decide the issue." Baltimore Gas & Elec. Co. v. Flippo, 684 A.2d 456, 464 (Md. Ct. Spec. App. 1996), aff'd, 705 A.2d 1144 (Md. 1998) (citing Schwier v. Gray, 357 A.2d 100, 102-03 (Md. 1976); Menish, 356 A.2d at 238).

Contributory negligence only defeats recovery if it is a proximate cause of the accident; "otherwise, the negligence is not contributory." Kassama v. Magat, 767 A.2d 348, 359 (Md. Ct. Spec. App. 2002) (citing Batten v. Michel, 292 A.2d 707, 711-12 (Md. Ct. Spec. App. 1972)). As a result, "[t]he law holds a driver responsible for an accident only when he or she can be blamed for contributing to the event. Negligence that does nothing to cause a mishap cannot create accountability." Myers v. Bright, 609 A.2d 1182, 1188 (Md. 1992); Kassama, 767

16

A.2d at 359.   Hence, "even when a plaintiff's negligence is established, an independent issue still remains with respect to causation." Rosenthal v. Mueller, 720 A.2d 1264, 1268 (Md. Ct. Spec. App. 1998).

The "defendant has the burden of establishing contributory negligence on the part of a plaintiff." Bright, 609 A.2d at 1186 (citing Atlantic Mutual v. Kenney, 591 A.2d 507, 512 (1991).

**2.    Defendants did not establish that any alleged act of negligence committed by Plaintiff proximately caused the crash.**

The burden of establishing that any act or omission of Plaintiff caused the injuries he suffered rests squarely on Defendants.   Bright, 609 A.2d at 1186. Defendants failed to prove that any action taken by, or omission of, Plaintiff proximately caused his injury.   Moreover, even if Defendants had advanced a theory regarding causation, because Plaintiffs also advanced a theory of causation (discussed in Section III, infra), reasonable minds surely could have differed in declaring Plaintiff's actions to be the cause of his injuries.   Therefore, the trial court committed reversible error in ruling that Plaintiff was contributorily negligent.

**i.    The trial court' ruling as to contributory negligence.**

The trial court's ruling regarding contributory negligence began with its discussion of the safety pin.   The trial court stated:

17

He removed a safety pin in the steering column but couldn't replace it. Now, there's some dispute about that, but on this summary judgment record, I conclude that no reasonably juror could conclude that he did, in fact, replace it.  [2532].

*     *     *

It's pretty clear on this record, with all the inferences in favor of the plaintiff, that there's no reasonable conclusion that could be reached other than that pin was not in. . .  [2533].

*     *     *

It's not surprising that he lost control of the steering because that's exactly what was predicted by the manual and by the labeling in this car that says if you take [the safety pin] out, you may lose steering control.  [Id.].

The trial court continued, regarding contributory negligence:

[W]ith all the inferences in favor of the plaintiff, [this Court concludes] that what he did was just plain reckless and foolish and in disregard for the potential consequences of operating a system on a vehicle that he had never done before.

He claims he did it with an earlier vehicle, but this vehicle had been on the road for a couple of years at least, had never been operated by him.  He claims is the exact same system. I'll assume that maybe it is. But he had not operated this vehicle before.  He had never received the training required by the manufacturer for this vehicle.  He may have had a demonstration but not the intensive period of training that's required to be able to operate this vehicle with this mechanism installed.  [2535].

*     *     *

[H]e chose to operate a vehicle for which he had not been properly trained or certified.  He operated it in mixed mode that is specifically not recommended; in fact, cautioned against by the manufacturer and

18

installer of the equipment.  The plaintiff claims that nobody can explain what training is necessary.

But the defendants' experts testified that drivers of vehicles using this type of system need to be fully trained, licensed and qualified in the safe operation of the vehicle with the EMC driving controls, as verified by a professional driver rehabilitation specialist. He had no such verified training.

And what he did with this vehicle clearly was contributorily negligent.  I conclude that no jury could possibly find that he operated with reasonable care for his safety or the safety of others.  [2536].

### ii.    The trial court's ruling as to contributory negligence was reversible error.

The trial court's ruling as to contributory negligence was founded on its conclusions that the safety pin was not engaged, Plaintiff lacked proper training and certification, and operated the Van in mixed mode.[2]  The trial court did not make a finding that any specific act or omission of Plaintiff caused the crash.  It simply concluded that what Plaintiff did was "just plain reckless and foolish and in disregard for the potential consequences" and "what he did with this vehicle clearly was contributorily negligent."  This conclusion without a finding regarding causation, and absent evidence from Defendants to establish causation, was reversible error.

---

[2] The trial court likely focused on these issues as related to contributory negligence because of Defendants arguments that Plaintiff was contributorily negligent because he was "untrained," [909], did not disengage the AEVIT from handicap mode [id.], had never driven the Terraza using the AEVIT system, had never been instructed to drive the Van in mixed mode [id.], and did not call a Ride-Away representative to discuss driving the Van.  [Id.]

Notably absent from Defendants' respective motions for summary judgment, and oral arguments, was a link between Plaintiff's myriad alleged acts of contributory negligence and his injuries.   In other words, to borrow from Defendants, Defendants' theory of causation is nothing more than "ipse dixit" – because I said so.  The glaring absence of such causation argument or evidence is, perhaps, why the trial court reached no conclusion regarding causation.  The trial court simply did not have before it sufficient evidence to reach such a conclusion.

As a result, the trial court should have denied the motions for summary judgment on this point because "even when a plaintiff's negligence is established, an independent issue still remains with respect to causation."  Rosenthal, 720 A.2d at 1268.

The failure of Defendants to prove causation, and therefore, the need to reverse the trial court's ruling, is clear from the record in this case.  Regarding the disengaged safety pin, Defendants' engineering expert could not say that the safety pin caused the crash.  Consider:

> Q: Okay.  Just so I'm 100 percent clear, you can't say that taking the pin out contributed to the accident within a reasonable degree of engineering probability, correct?
>
> Mr. Stapleton: Objection.
>
> By Mr. Valente:
> Q: Correct?
>
> A: I can't to a reasonable degree of engineering certainty, no.  [787].

20

Thus, the trial court's ruling that the disengaged safety pin cause the Van to lose control was not only unfounded, but contrary to the testimony of Defendants' engineering expert.

Regarding Plaintiff's alleged lack of training, because Mr. Peters did not know what caused the crash ("I don't have the cause, as I've mentioned several times already" [788-89]), and therefore, he did not, nor could he, offer the opinion that a lack of training caused the crash.[3]  Similarly, he did not hold the opinion that driving in mixed mode caused the crash.  Therefore, Defendants' engineering expert's opinion, could not have served as a basis for the trial court to find that Plaintiff caused the injuries he suffered.

Mr. Nuza is not an engineer.  [765].  Nevertheless, he offered the opinion that Plaintiff caused the crash because he was not properly trained.  [1408]. However, Mr. Nuza could not say what act or omission, due to the lack of training, actually caused the crash, which is necessary to establish causation.  [1408-34]. Thus, the trial court could not have concluded, based on Mr. Nuza's testimony, that Plaintiff caused the crash.

Finally, Mr. Clendenin is not an engineer.  [801].  He too, however, endeavored to offer the opinion that Plaintiff's lack of training caused the crash.

---

[3] Importantly, to the extent he attempted to offer such evidence, it would be contradictory to other testimony, and therefore, reasonable minds could differ as to whether a lack of training caused the crash.

[990].  Like, Mr. Nuza, he could not say what particular act or omission of Plaintiff caused the crash.  [990].  Thus, none of Defendants' experts could say how any lack of training, licensing, or qualification caused the crash.  As such, the trial court had no basis to find contributory negligence on this ground.

Moreover, no expert could say how driving in mixed mode proximately caused the crash.

Nevertheless, the trial court concluded that what Plaintiff "did with this vehicle clearly was contributorily negligent."  However, this ruling was unsupported by the evidence.

Absent such testimony, the trial court's ruling was unsupported, and therefore, reversible error.

> **C.    The trial court committed reversible error in granting Defendants' motions for summary judgment on the ground of assumption of the risk, because Defendants did not prove causation.**

### 1.    Legal Standard

The defense of assumption of the risk "is grounded on the theory that a plaintiff who voluntarily consents, either expressly or impliedly, to exposure to a known risk cannot later sue for damages incurred from exposure to that risk." Crews v. Hollenbach, 751 A.2d 481, 488 (Md. 2000) (citing, inter alia, Imbraguglio v. Great Atlantic & Pacific Tea Co., 747 A.2d 662, 672 (2000)).  In

other words, in order for assumption of the risk to operate as a bar to recovery, the risk assumed must be the risk that caused the injury.

In order to establish assumption of risk as a defense, "the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." Meyers v. Lamer, 743 F.3d 908, 912 (4th Cir. 2014) (citing ADM P'ship v. Martin, 702 A.2d 730, 734 (1997)). Ordinarily, it is for the jury to determine whether a plaintiff assumed the risk. Meyers, 743 F.3d at 912 (citing Warsham v. James Muscatello, Inc., 985 A.2d 156, 168 (Md. Ct. Spec. App. 2009)). Thus, the burden of proving the defense of assumption of the risk rests with the defendant. Id.

"In determining whether a plaintiff had the requisite knowledge, an objective standard is applied." Am. Powerlifting Ass'n v. Cotillo, 934 A.2d 27, 33-34 (2007) (citing Crews v. Hollenbach, 751 A.2d at 490)). A trial court may only determine the question of assumption of the risk "where reasonable persons could not differ as to the conclusion." Poole v. Coakley & Williams Const., Inc., 31 A.3d 212, 223 (2011) (citing Restatement (Second) of Torts § 496D cmt. e (1965)).

### 2. Defendants did not establish that any alleged act of negligence committed by Plaintiff proximately caused the crash.

As with contributory negligence, the burden of establishing the defense of assumption of the risk rests on Defendants. Meyers, 743 F.3d at 912. Defendants'

failure to prove causation should also result in the reversal of the trial court's ruling as related to assumption of the risk.

### i.    The trial court' ruling as to assumption of the risk.

Regarding assumption of the risk, the trial court issued the following ruling:

> Where[,] as here, the way this vehicle was being operated was not in the proper mode, neither in the handicap/disabled mode nor in the able-bodied mode.  And the kinds of things that happened with this vehicle when it was placed in this situation are precisely those that were predicted by the manufacturer of the equipment in its warnings placed with the equipment on board on this vehicle.
>
> Whether the risk was assumed voluntarily is another issue, and that depends on whether the plaintiff had a reasonable alternative.  In this case he clearly had a reasonable alternative.  Other vehicles were available to bring his son home.  He knew that the vehicle was malfunctioning.  He wasn't able to convert it to the able-bodied mode, couldn't put the pin back in, it wasn't working properly, and I conclude that this was a known risk, that he assumed the risk of it, and he had plenty of opportunities to avoid the catastrophic incident that occurred.  [2537-38].

*    *    *

> [W]hat he did does not pass the standard of assumption of the risk that would preclude him from recovery in this case, and that's, among other things, demonstrated by his practice run, when he knew – he wanted to see if he could do it, even though he's not supposed to, and it worked in a parking lot, and he went out on the open road and the rest is history.  [2538].

### ii.    The trial court's ruling as to assumption of the risk was reversible error.

The basis of Defendant's assumption of the risk claim is that the manual and the vehicle contained warnings that the Van should not be operated without the

24

safety pin engaged. According to the manual, if the vehicle was operated without the safety pin engaged, the risk existed that the second pin would become disengaged and the vehicle would crash. Thus, in order to prevail on their assumption of the risk defense, Defendants were required to establish that Plaintiff was injured as a result of driving without the safety pin engaged. However, it is undisputed that the second pin did not become disengaged. Moreover, no expert ever testified as to what about operating the vehicle in mixed-mode caused the crash. Nevertheless, the trial court found that Plaintiff assumed the risk. Because the trial court lacked sufficient evidence upon which to base its conclusion that driving in mixed mode and/or without the safety pin engaged caused the crash, granting Defendants' motions on the ground of assumption of the risk was reversible error.

If the risk assumed does not cause the injury, assumption of the risk cannot bar a claim. See Crews, 751 A.2d at 488. An analogous scenario helps to elucidate this point of law.

Consider a mountain hiker in a park coming to a deteriorating, swinging bridge over a gorge. Immediately in front of the swinging bridge is a sign that says, "WARNING: DO NOT CROSS BECAUSE DETERIORATING BRIDGE CONDITIONS MAY RESULT IN FALLING THROUGH." In spite of the warning, the hiker begins to cross the bridge. While crossing the bridge, which

25

**could have** resulted in the hiker falling through the bridge into the gorge below, a park worker runs across the bridge, unintentionally knocking the hiker over the bridge, into the gorge. Under those facts, the defense of assumption of the risk would not bar the hiker's recovery because even though he assumed the risk of falling through the bridge, he was injured due to an unrelated negligent act. He could, then, still recover against the park for negligence, because an act unrelated to the integrity of the bridge caused him to fall.

The very same scenario played out in the instant case. Here, the alleged risk assumed was the risk of the engage pin becoming disengaged as a result of the safety pin not being replaced. However, the engage pin did not become disengaged. Specifically, Mr. Nuza testified that "the engage pin does not look pulled out." [1422]. No other expert testified that the crash was caused because the safety pin was not replaced. Therefore, though it is possible Plaintiff assumed the risk of driving without the safety pin in place, no evidence existed before the trial court to prove that the risk assumed – the engage pin becoming disengaged – actually caused the injury. Therefore, it is possible, or even likely, that another event caused the crash. Either way, the burden of proof rested with Defendants and they did not satisfy their burden. As with the mountain hiker, Plaintiff is not barred from recovery by assumption of the risk.

26

Furthermore, no expert testified how driving the vehicle in mixed mode caused the crash.  Therefore, even if Plaintiff assumed the risk of those two actions, because Defendants cannot establish that the consequences of those actions – driving without the pin – caused or contributed to the crash, assumption of the risk cannot serve as a bar to Plaintiff's claim.  Because Defendants did not prove that the risk assumed caused Plaintiff's injuries, the trial court committed reversible error in granting summary judgment on the ground of assumption of the risk.

### D.    Product misuse.

### 1.    Legal Standard

"Misuse of a product may bar recovery against the manufacturer where the misuse is the sole proximate cause of damage, or where it is the intervening or superseding cause."  Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988) (citing Ellsworth v. Sherne Lingerie, Inc., 495 A.2d 348, 355 (1985)).  Defendants agree that in order for a defendant to prevail on summary judgment on the issue of product misuse, the trial court must "say as a matter of law that the plaintiff's manner of use of the product cut off the chain of proximate causation. . ."  [910].  Thus, product misuse can only bar recovery where the misuse is the cause of the injury.

**2.      The trial court committed reversible error in granting Defendants' motions for summary judgment as to product misuse because Defendants could not establish as a matter of law that any misuse of the product by Plaintiff "cut off the chain of proximate causation."**

**i.      The trial court' ruling as to product misuse.**

In ruling on the defense of product misuse, the trial court concluded:

> Sellers may be liable for damage caused by defective, unreasonably dangerous products.  But product misuse can also cut off the chain of causation for negligence claims.
>
> For both strict and negligence-based products liability claims, the manner of use must be reasonably foreseeable to the seller.  In other words, the seller should anticipate that this type of use is going to be made.  And users are assumed to have read and heeded applicable warnings, and a product which is safe for use if the warnings are followed is not in defective condition, nor is it unreasonably dangerous.
>
> With respect to the equipment in this case, the plaintiff was not following the clear warning about driving without proper training.  He was also acting contrary to the notion of mixed mode driving or something that is not fully in the automated mode for handicapped operation, nor in the mode for able-bodied operation.  [2538-39].

**ii.      The trial court's ruling as to product misuse was reversible error.**

Product misuse can only serve as a bar to recovery where a specific act or misuse is determined to be the sole proximate cause of a plaintiff's injury or to be an intervening and superseding cause of the complained of injuries.  Thus, in order for the trial court to have properly granted summary judgment as to Defendants' motions for summary judgment on product misuse, the trial court was required to find that Plaintiff's alleged misuse of the Van was "the sole proximate cause of

damage," or that it was "the intervening or superseding cause." Higgins, 863 F.2d at 1167. Defendant was required to establish this through expert testimony. They did not, and therefore, the court's ruling was reversible error.

Here, the trial court ruled that Plaintiff misused the product by "not following the clear warning about driving without proper training" and "acting contrary to the notion of mixed mode driving. . ."[4] [2539]. However, none of Defendants' experts were able to say how any of these alleged acts of product misuse caused Plaintiff's injuries. As noted above, Defendants' experts offered no opinion beyond the bald statement that the crash was caused by Plaintiff's lack of training. However, they could not state what about the lack of training caused the crash, and therefore, did not establish causation. As a result, the trial court had no evidence before it to permit it to conclude that any act or omission of Plaintiff was the sole proximate cause of the injuries, or an intervening or superseding cause. Plaintiff, on the other hand, offered a clear theory of causation. [See Section III infra]. Thus, there was no way for the trial court to properly conclude that product misuse barred Plaintiff's claims. Hence, the trial court committed reversible error in granting summary judgment in favor of Defendants on the ground of product misuse.

---

[4] Defendants set out several instances of alleged misuse including "driving in handicap mode without the détente pin installed" [910], "[d]riving the AEVIT system without obtaining prior proper training" [911] and "[d]riving the AEVIT system in so-called 'mixed-mode.' " [Id.].

E.    **Failure to read warning.**

1.    **Legal Standard**

A plaintiff who does not read a warning, or who reads the warning "and then proceeds voluntarily and unreasonably to encounter the danger thereby made known to him will assume the risk of that danger." Ellsworth, 495 A.2d at 356.

2.    **The trial court committed reversible error in granting Defendants' motions for summary judgment as to failure to read warnings because Defendants could not establish as a matter of law that Plaintiff's failure to read the warnings caused, or was even a cause, of his injuries.**

    i.    **The trial court's ruling as to failure to heed warnings.**

Regarding Plaintiff's failure to read and/or heed warnings, in addition to the trial court's statement that "users are assumed to have read and heeded applicable warnings," the trial court concluded that:

> [Plaintiff] was provided with numerous warnings about safe operation, and he simply chose not to read them until after the accident, even though they were available to him. [2540].

    ii.    **The trial court's ruling as to failure to read warnings was reversible error.**

The case law makes clear that in order for a plaintiff's failure to read a warning to bar recovery, the plaintiff must encounter the danger warned against. Here, the warnings at issue are those that warn against operating the Van without the safety pin installed. [911] ("WARNING: DO NOT OPERATE THIS VEHICLE WITHOUT THE SAFETY PIN INSTALLED). The purpose of the

safety pin was to prevent the engage pin from becoming disengaged.  Therefore, if the safety pin was not installed, the possibility existed that the engage pin could slip out during driving, which could have resulted in a loss of steering.  Therefore, the purpose of the warning regarding the safety pin was to make sure drivers avoided the risk of the engage pin slipping out.  Thus, in order for a failure to read that warning to serve as a basis for denying Plaintiff's claim, the trial court was required to find that Plaintiff encountered the danger warned of – the engage pin becoming disengaged.

Though the trial court may have made such a finding, it was not founded on any evidence or testimony offered by any expert.  To be sure, after the crash, Mr. Nuza testified that the engage pin was engaged.  [1422].  No other expert testified that the engage pin ever became disengaged.  Moreover, Mr. Peters could not say that the uninstalled safety pin caused the crash.  [787].  (Q: Okay.  Just so I'm 100 percent clear, you can't say that taking the pin out contributed to the accident within a reasonable degree of engineering probability, correct?  A: I can't to a reasonable degree of engineering certainty, no.).  Therefore, as it relates to the safety pin, the trial court did not have before it any evidence establishing that Plaintiff encountered the danger – the slipping of the engage pin – warned against.  Consequently, the trial court committed reversible error in granting summary judgment on failure to read the safety pin warnings.

31

Defendants further urged the trial court to grant summary judgment on this point as it related to Plaintiff not reading the safety manual because the safety manual warned that one should not drive the van without proper training. However, like with the safety pin, none of Defendants' experts was able to say how a lack of training caused the crash. Therefore, the trial court committed reversible error in granting summary judgement on the failure to read the proper training warnings.

## III. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN GRANTING DEFENDANTS' MOTIONS TO STRIKE, AND EXCLUDE THE TESTIMONY OF, PLAINTIFF'S EXPERT, MARK EZRA.

Mr. Ezra's opinions were more than sufficient to satisfy the requirements of Federal Rule of Evidence 702 and <u>Daubert</u>. Nevertheless, the trial court struck him as an expert, ruling that "he did not have sufficient facts or data," "did not produce an opinion that was the product of reliable principles or methods, and he did not reliably apply them to the facts of the case." As outlined below, the trial court's ruling was an abuse of discretion, and therefore, should be reversed.

### A. Legal Standard

In Federal Courts, the introduction of expert testimony is governed by Federal Rule of Evidence 702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

With Rule 702 in mind, when ruling on the admissibility of expert testimony, a trial judge must determine whether the proffered expert testimony is 1) based on scientific, technical, or other specialized knowledge and 2) whether the proffered testimony "will assist the trier of fact to determine a fact in issue." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993); Westberry v. Gislaved Gummi AB, 178 F.3d 257, 260 (4th Cir. 1999). Thus, an expert's testimony is admissible under Rule 702 if it "rests on a reliable foundation and is relevant." Id. (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999)).

"The inquiry is a flexible one, and its focus must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 580; Westberry, 178 F.3d at 261 ("the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct"). Trial courts should "be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence." Westberry, 178 F.3d at 261 (4th Cir. 1999) (citing Cavallo v. Star Enter., 100 F.3d 1150, 1158–59 (4th Cir.1996)); see

33

also Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 780 (3d Cir. 1996) (Rule 702 "has a liberal policy of admissibility").

The "first prong" of a trial court's inquire inquiry into the admissibility of expert testimony "necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable – that is, whether it is supported by adequate validation to render it trustworthy." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 260 (4th Cir. 1999) (citing Daubert, 509 U.S. at 590). Factors the trial court may use to analyze the proposed expert testimony under the "first prong" include, "whether the expert opinion can be tested"; "whether it has been subject to peer review"; "the rate of error of the methods employed by the expert"; "the existence and maintenance of standards used in the expert's methods"; "and whether the expert's methods have been generally accepted by his or her respective community." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 261 (4th Cir. 2005) (citing Daubert, 509 U.S. at 592-94).

"The second prong of the inquiry requires an analysis of whether the opinion is relevant to the facts at issue." Id. (citing Daubert, 509 U.S. at 591-92). When addressing the "second prong," the trial court must determine whether the "expert testimony proffered in the case is sufficiently tied to the facts of the case that it will

aid the jury in resolving a factual dispute." <u>Daubert</u>, 509 U.S. at 591 (<u>quoting</u>

<u>United States v. Downing</u>, 753 F.2d 1224, 1242 (3rd Cir. 1985)).

Admissibility need only be established by a preponderance of proof. <u>Cooper</u>

<u>v. Smith & Nephew, Inc.</u>, 259 F.3d 194, 199 (4th Cir. 2001) (<u>citing</u> <u>Daubert</u>, 509

U.S. at 592, n.10).

### B.    The Trial Court's Ruling.

The trial court rendered the following decision on Defendants' respective

motions to strike Mark Ezra, Plaintiff's engineering expert:

> I have little doubt that Mr. Ezra, in general, has specialized
> knowledge. I don't need to go into whether he has degrees in the
> subjects he claims to have degrees in and so forth.
> But the problem with his proposed testimony is the other
> aspects of opinion testimony by an expert. He has no experience with
> the specific system involved in this case. And that's of some note, but
> I don't think that that disqualifies it totally just because he doesn't
> have experience with this particular system. He has knowledge of
> drive-by wire systems, but only in motorcycles, never one installed in
> a motor vehicle [like] this one.
> He doesn't have any knowledge about training, and he said it
> had no relevance. Yet, that's inconsistent with the conclusion that
> I've reached with respect to contributory negligence and assumption
> of the risk and his failure to have any training at all, as required by the
> manufacturer and seller, and the actions that he took were
> [completely] inconsistent with what's contained in the instruction
> manuals that were given to him had be bothered to read them before
> this crash.
> Mr. Ezra primarily opined that a lot of things were not
> important or not worth testing, which was perplexing to me, including
> any questioning about how the brake roller could be out of place by
> attempting to use your foot to brake or by cause of the accident.
> And I conclude, for the reasons advanced by the defendants,
> that he did not have sufficient facts or data. He did not produce an

35

opinion that was the product of reliable principles or methods, and he did not reliably apply them to the facts of the case. Accordingly, to the extent that I need to reach it, I would grant the motion to exclude his testimony. [2543-44].

In order to bring into focus the issues before this Court, it is important to note that the trial court's ruling was not based on a lack of credentials or a lack of specialized knowledge possessed by Mr. Ezra. [2543] ("I have little doubt that Mr. Ezra, in general, has specialized knowledge. I don't need to go into whether he has degrees in the subjects he claims to have degrees in and so forth."). Further, the trial court's ruling to strike Mr. Ezra was not based on a perceived lack of experience "with the specific system involved in this case." [2543-44] ("He has no experience with the specific system involved in this case. And that's of some note, but I don't think that that disqualifies it totally just because he doesn't have experience with this particular system.").[5] To be sure, the trial court found, however begrudgingly, that Mr. Ezra was sufficiently qualified as an engineer to serve as an expert in the field of engineering and that he possessed sufficient knowledge to render the opinions he formulated.

---

[5] Even though Mr. Ezra's experience with AEVIT systems did not serve as a basis for the trial court's ruling, the trial court's characterization of Mr. Ezra's experience with AEVIT systems was inaccurate. As matter of fact, Mr. Ezra has "examined and provided expert opinions on a functionally identical gas/brake system designed by [EMC]," and has further analyzed two other EMC AEVIT equipped vans involved in crashes. [2144]. To be sure, his qualifications and familiarity with servomotor systems, and specifically the AEVIT system, have resulted in his acceptance as an expert in two prior Federal cases involving EMC systems. [2144, 2196-2206].

Thus, the only bases upon which the trial court struck Mr. Ezra, and therefore, the only issues before this Court, are that the trial court found that Mr. Ezra "did not have sufficient facts or data," "did not produce an opinion that was the product of reliable principles or methods, and he did not reliably apply them to the facts of the case." [2544].

### C.    Mr. Ezra's Opinion.

The trial court struck Mr. Ezra's ultimate opinion that just prior to the crash, the brake roller migrated out of place, preventing the brakes from working, thereby causing the Van to crash.  In addition to Mr. Ezra's knowledge, training and expertise in the field of engineering, which are not in dispute, his opinions are based on two grounds: 1) the data derived from the Data Logger and the OEM recorder and 2) the position and flexibility of the brake roller, and his measurement, during his two in-person observations.  In spite of the foundation for Mr. Ezra's opinions, which came from the same materials upon which Defendants' experts' opinion were formulated, the trial court by concluded that "he did not have sufficient facts or data" for his opinion and that "[h]e did not produce an opinion that was the product of reliable principles or methods, and he did not reliably apply them to the facts of the case." [2544].  As demonstrated below, this was reversible error.

**D.    Materials reviewed by the experts in this case.**

Prior to addressing the merits of the trial court's ruling, an understanding of the materials and facts relied upon by Mr. Ezra in formulating his opinion is necessary.

Of great importance to this Court's abuse of discretion evaluation of the trial court's ruling is the fact that the materials reviewed by Mr. Ezra are the same materials reviewed by the Defendants' experts. Thus, this Court can undertake its evaluation of the trial court's ruling on the expert issue with the knowledge that all the experts in this case formulated their opinions based on the same materials and facts. Moreover, there is not now, nor has there been, any dispute as to which materials Mr. Ezra reviewed in connection with forming his opinion.

Specifically, Mark Ezra reviewed, among others, the following materials: AEVIT Gas and Brake Systems Instruction Manual; Crash Data Retrieval; AEVIT Owner's Manual for the Cady Van; Data Logger Date from the Cady Van; photographs of the Van in post-crash condition. [2151-52]. He also conducted two vehicle inspections, one of which was conducted Plaintiff's counsel present, and one of which was conducted with Defense counsel present. In his expert report, he set out a detailed recitation of "Pertinent Facts," which were the same facts relied upon the Defense experts. [2153]. His opinion was founded primarily

on his review of the listed documents and the observations and measurements he took during his two vehicle inspections.

Defendants' experts also reviewed AEVIT Gas and Brake Systems Instruction Manual; Crash Data Retrieval; AEVIT Owner's Manual for the Cady Van; Data Logger Date from the Cady Van; photographs of the Van in post-crash condition.  Neither Defendants, nor Defendants' experts, contested the validity or scientific accuracy of the data supplied by the Crash Data Retrieval of the Data Logger.  Likewise, they did not contest the authenticity of the manuals reviewed by Mr. Ezra, which Defendants themselves generated.

In consideration of the complete overlap of the material reviewed by both Plaintiff's and Defendants' experts, there can be no question that deriving an opinion from the data reports and manuals is accepted by the scientific community. That the opposing sides drew different conclusions based on their analysis of those materials is of no moment, nor is it surprising.  Had the opposing experts agreed about the meaning of the information drawn from the accepted materials, this case never would have proceeded to suit.

**E.    The trial court's ruling to strike Mr. Ezra was an abuse of discretion and therefore, should be reversed.**

As noted above, the trial court's decision to strike Mr. Ezra was based on its erroneous conclusion that "he did not have sufficient facts or data," "[h]e did not produce an opinion that was the product of reliable principles or methods" and "he

did not reliably apply them to the facts of the case." [2544]. For the reasons set forth below, the trial court abused its discretion in striking Mr. Ezra, and therefore, its ruling should be reversed.

### 1. Mr. Ezra's opinion was based on sufficient facts and data.

The trial court's ruling that Mr. Ezra's opinions were not based on sufficient facts and data is the most perplexing part of its ruling. As outlined above, Mr. Ezra's opinions were based on the exact same set of facts and the exact same data as Defendants' experts. Specifically, both Plaintiff's and two of Defendants' experts, Mr. Peters and Mr. Nuza, relied on, among other things, the AEVIT Gas and Brake Systems Instruction Manual; Crash Data Retrieval; AEVIT Owner's Manual for the Cady Van; Data Logger Date from the Cady Van; and photographs of the Van in post-crash condition.[6] In addition, Mr. Ezra's opinions were further based on his two in-person evaluations of the van, which included taking measurement. There is absolutely no dispute that the material relied upon by Mr. Ezra is authentic, accurate, and, in fact, with the exception of his measurements, generated by the Defendants. The trial court was simply wrong in ruling that Mr. Ezra's opinion was not based on sufficient facts and data.

---

[6] Mr. Clendenin, however, reviewed nothing other than a set of photographs and Defendants' expert designation. [2545]. He was, for reasons unclear, found to be an acceptable expert witness by the trial court. [808-09].

40

### 2. Mr. Ezra's opinions were the product of reliable principles and methods.

#### i. Mr. Ezra's opinions were based substantially on the data produced by the Van immediately prior to the crash.

Mr. Ezra's opinion that prior to the crash, the brake roller migrated out of place, preventing the brakes from working was based significantly on the data logger readings, relied upon by every expert in the case, which demonstrated, as a matter of fact, that in the seconds prior to the crash, the break was being applied, but the Van was accelerating. Because of this, Mr. Ezra opined that a mechanical failure caused the crash, as opposed to an act or omission of Plaintiff.

Mr. Ezra offered that exact interpretation of the data logger readings, and Mr. Peters agreed. Specifically, in his report, Mr. Ezra offered the following factual assessment of the AEVIT Data Logger data:

> [F]rom approximately 62 seconds on the time axis through approximately 74 seconds, the van's speed increases in spite of the gas/brake controller calling for substantial braking, and the gas/brake servo motor responding appropriately. [2162].

Mr. Peters's assessment of the exact same data was similar. He agreed that prior to the crash, Plaintiff was calling for the break, but the speed was increasing. The following exchange occurred at Mr. Peters's deposition:

> Q: And I'll ask you, Mr. Peters, based on your review of the data logger, in any time period in the 10 seconds leading up to the accident, do you see where there is a break command but the car is speeding up?
> Ms. Dasti: Objection to form; vague.

41

A:  In looking at both the CDR data, which is the crash date recorder data, and the speed coming from the AEVIT system, it shows that in the three seconds prior – correction – four seconds prior to the impact with the tree, the brakes were – the brake switch was called for as on, and there was a slight increase in the speed of the vehicle.  [790].

*        *        *

Q:  But we can agree that brakes are being applied, but the speed is increasing, correct.

Mr. Stapleton:  Objection to form.

Ms. Dasti:  Objection to form and foundation.  Go ahead.

A:  It looks like there is a small increase in speed, yes.  [790].

### ii.    Mr. Ezra's opinions were also based on his observation and measurements.

Mr. Ezra's opinion is also based on his observations and measurements of the Van following the crash, which revealed that the break roller was out of place and prone to flexing.   In his report, Mr. Ezra offered the following opinions/observations/facts from his initial inspection which occurred on March 24, 2013:

- During our initial inspection of the van [on March 24, 2013], we noted that the accelerator/brake servo motor was mispositioned relative to the EMC brake pedal extension plate.  The servo motor roller was not engaging the EMC brake pedal extension plate adequately.  The roller assembly on the servo output arm was only engaging the brake pedal extension plate on a circular black plastic retainer; the estimated width of contact with the extension plate was between 1/16 inches and 1/8 inches.  [2155].

42

- The brake pedal adaptor plate appears to have been installed incorrectly as there are several holes in this plate which have not been used and it does not appear to be mounted squarely to the OEM brake pedal or the output arm of the gas/break servo motor. [2156].

Mr. Ezra conducted a second inspection on July 17, 2013, during which he noted the following:

- The inspection of July 17, 2013 revealed that the OEM brake pedal appears to have a lateral movement due to flexibility of the brake pedal arm, resulting in a sideways movement measured at the brake pedal itself, of approximately ¼ inch. [2159].

In his deposition, he testified that "what would have caused [the disconnection of the roller arm] would be just the normal flexing of the passenger compartment due to whatever terrain it's going over, twists." [700]. Mr. Ezra explained that this occurred at some point prior to 61 seconds because at that point, "the brake no longer slows the vehicle." [699-700].

### 3. In spite of Mr. Ezra's factual and data based opinions, the trial court struck him because it did not agree with the conclusions of his opinions.

The trial court's decision to strike Mr. Ezra demonstrates that it struck Mr. Ezra because of the conclusions he generated, not on the principles and methodology he employed in formulating his opinions. This is inappropriate, and an abuse of discretion, as a trial court's "focus must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 580; Westberry, 178 F.3d at 261 ("the court need not determine that the expert

43

testimony a litigant seeks to offer into evidence is irrefutable or certainly correct"). Moreover, the trial court's ruling, in view of the deep factual foundation for Mr. Ezra's opinions, was contrary to the intention of Rule 702, which is to "liberalize the introduction of relevant expert evidence"  Id. (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999)).  A further look at Mr. Ezra's opinions makes the trial court's abuse of discretion clearer.

Mr. Ezra concluded that the break system failed, which caused the crash, based on the fact that the break was applied but did not slow the Van prior to the crash, and the fact that the roller was out of place and demonstrated flexibility. [1037-40, 2155, 2159].  Mr. Ezra was further of the opinion that because the failure of the break roller caused the crash, no act or omission on the part of Plaintiff caused the crash.  [627-29].  Therefore, the issues of training and pin placement were not germane to his opinion.

The trial court, however, disregarded Mr. Ezra's fact based opinions because it was "inconsistent" with the conclusions of law the trial court reached. Specifically, the trial court stated, "[h]e doesn't have any knowledge about training, and he said it had not relevance."  [2544].  The trial court continued, remarking, "that's inconsistent with the conclusion that I've reached with respect to contributory negligence and assumption of the risk and his failure to have any training at all, as required by the manufacturer and seller, and the actions that he

took were [completely] inconsistent with what's contained in the instruction

manuals that were given to him had be bothered to read them before this crash."

[Id.]. Mr. Ezra did, indeed, hold the opinion that Plaintiff's training was irrelevant,

but that opinion was supported by very clear, reasoned testimony.

> A: The accident would have happened whether it happened to him
> using it or whether his son were using it or some other person were
> using it. It's a mechanical failure in the interface section between the
> control system designed and developed b EMC and installed by Ride-
> Away and the vehicle itself. . .
>
> Q: So, Mr. Ezra, is it fair then to say that your analysis in this case
> does not take into account human error at all by the user of the vehicle
> causing the collision?
>
> A: No. That would be a misstating of my opinions.
>
> Q: Okay. How, if at all, did you consider human error by the user by
> Mr. Cady, Senior in causing the collision?
>
> A: I looked at the data log and its output and what he appeared to be
> commanding, which was stopping, and the way the EMC unit was
> responding in a stopping direction. And I looked at the speed, and the
> van was not slowing down. So I did consider especially over the ten
> seconds or eight seconds before the impact what control inputs were
> being placed there, which would be placed by the human operating the
> control. . . [627-29].

Thus, Mr. Ezra's opinion is that training simply had no bearing on the cause of the

crash in this case because, in his opinion, a mechanical failure caused the at-issue

crash. He then made clear that he took into consideration human error, evaluated

based upon his review of the data log. The trial court evidently disagreed, but such

disagreement cannot legally serve as a basis to strike an expert. The trial court's

45

observation that Mr. Ezra's opinion was "inconsistent with the conclusion that I've reached," which the trial court used as a basis for its ruling, is far beyond what is permitted of a trial judge in his gate-keeping role. Certainly, such a statement demonstrates that the trial court's focus was on the conclusions generated by Mr. Ezra, and not "solely on principles and methodology," which underpinned his opinion, as required by <u>Daubert</u>. This was an abuse of discretion.

The trial court also expressed concern about several "things" it concluded Mr. Ezra believed "were not important or not worth testing. . .including any questioning about how the brake roller could be out of place by attempting to use your foot to brake or by cause of the accident." [2544]. Mr. Ezra found these points irrelevant to his opinion, but not unworthy of consideration. Consider, for example, the issue of the brake rolling slipping out of place "by attempting to use your foot to brake." Mr. Ezra addressed this point in no uncertain terms. Consider the following exchange:

> Q: So is it accurate then to say in your analysis that the minimal or smaller force from a road would be sufficient to take the roller off the brake pedal, but Mr. Cady's force in using his foot against the brake pedal would not be enough to take the roller off the brake pedal?
>
> A: Given the large bracket and the thickness of the arm, it would be unlikely. I've not done that test, so I can't give you a definitive answer. But if you are assuming that he pushes down on the brake, so his foot is pushing downwards and only contacting with a small component of that downward force, a small component is going laterally, then its highly improbably that his attempt at braking, which

> is a downward action of his foot would have laterally shifted the roller,
> even the eighth of an inch.  [653].

Mr. Ezra had a clear opinion, based on facts, but the trial court pain it no consideration.  Instead, it appears the trial court simply disliked Mr. Ezra's opinion, and because the trial court wanted additional information, determined, on that basis alone, that his opinion was insufficient.  It was not.

### 4.    Mr. Ezra's opinions were reliably applied to the facts of this case.

The trial court's conclusion that Mr. Ezra did not reliably apply his opinions to the facts of the case is incorrect.  Mr. Ezra expressly applied the above findings to the case.  Based on the measurements he took, which are undisputed, and his interpretation of the data, produced by the Defendants, he formulated the opinion that the brake roller migrated out of place, preventing the brakes from working, thereby causing the Van to crash.  This opinion was based in its entirety on his knowledge, training, expertise in the field of engineering, and the information produced during, and generated as a result of, the instant litigation.  The bottom line is that Mr. Ezra's opinions were reliably applied to the facts of this case, and the trial court's ruling to the contrary was an abuse of discretion.  It should be reversed.

## **CONCLUSION**

For all of the reasons set forth herein, and those to be argued at Oral Argument, Appellant, John T. Cady, respectfully requests that this Honorable Court reverse the judgment of the District Court and remand this case to proceed consistent with the reversal.

Respectfully Submitted,

*s/ Matthew J. Chalker*
Matthew J. Chalker
The Valente Law Group
2200 Defense Highway, Suite 304
Crofton, MD 21401
(443) 333-4044
*Counsel for Appellant, John T. Cady*

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

Case No. 16-1183

John Cady

v.

Ride-Away Handicap Equipment, et al.

**<u>REQUEST FOR ORAL ARGUMENT</u>**

Appellant, John T. Cady, hereby requests an oral argument.


<u>s/ Matthew J. Chalker</u>
Matthew J. Chalker
*Counsel for Appellant, John T. Cady*

<u>June 17, 2016</u>
Date

49

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

Case No. 16-1183

John Cady

v.

Ride-Away Handicap Equipment, et al.

## **CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(b) because this brief contains 11,792 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(b)(iii), as verified by Microsoft Word 2013.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in size 14 Times New Roman style.

s/ Matthew J. Chalker
Matthew J. Chalker
*Counsel for Appellant, John T. Cady*

June 17, 2016
Date

50

## CERTIFICATE OF SERVICE

I certify that on ____June 17, 2016____ the required copies of the foregoing Appellant's Brief was filed via hand delivery and electronically using the Court's CM/ECF system which will send notification of such filing to:

Saamia H. Dasti, Esquire
WARANCH AND BROWN
1301 York Road, Suite 300
Lutherville, Maryland 21093
*Counsel for Defendant EMC*

David G. Harris, Esq.
GOLDBERG SEGALLA, LLP
800 Green Valley Road, Suite 302
Greensboro, NC 27408

Brian T. Stapleton, Esq.
GOLDBERG SEGALLA, LLP
11 Martine Avenue, Suite 750
White Plains, NY 10606-1934

s/ Matthew J. Chalker
Matthew J. Chalker